Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MITCHELL KATES, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>FAT BRANDS INC., ANDREW A. WIEDERHORN, KENNETH J. KUICK, and ROBERT G. ROSEN,<br><br>Defendants. | Case No. 2:24-cv-04775-MWF-MAA<br><br>Hon. Michael W. Fitzgerald<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED<br><br><u>CLASS ACTION</u> |

Lead Plaintiff Mitchell Kates ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges in this amended complaint the following upon personal knowledge with respect to his own acts, and upon information and belief as to all other matters based upon, *inter alia*, an investigation conducted by and through his counsel which included, among other things: review and analysis of relevant filings made by Defendant FAT Brands, Inc. ("FAT Brands" or "Company") with the United States Securities and Exchange

Commission ("SEC"); review and analysis of Defendants' public statements, public documents, and wire and press releases about the Company; media and analyst reports and advisories about the Company; information from related court filings; and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities fraud class action on behalf of all persons and entities who purchased publicly traded FAT Brands securities, including Fat Brands Class A common stock (ticker symbol: FAT), Fat Brands Class B common stock (ticker symbol: FATBB), Fat Brands 8.25% Series B Cumulative Preferred Stock (ticker symbol: FATBP), and Fat Brands Warrants (ticker symbol: FATBW), between March 23, 2022 and May 10, 2024, both dates inclusive ("Class," and the time period described the "Class Period"). On behalf of the Class, Plaintiff brings claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") for all persons and entities who purchased publicly traded FAT Brands securities during the Class Period at artificially inflated prices and were damaged when the artificial inflation dissipated upon the corrective disclosures.

2. FAT Brands is a public company that purports to generate revenues by acting as a restaurant brand franchisor, collecting franchise fees and ongoing royalty fees from its franchisees, who actually own and operate the restaurants. In the eyes of its former CEO, however, FAT Brands has served as a personal piggy bank for him and his family.

3. Unbeknownst to FAT Brands investors, for years, Andrew Wiederhorn used his control over FAT Brands and various other corporate entities to make, and

then forgive, personal loans of tens of millions of dollars to himself, and funded his and his family's lavish lifestyle using corporate funds.

4. On February 19, 2022, an article in the *Los Angeles Times* revealed that both the United States Department of Justice ("DOJ") and the SEC were conducting investigations into allegations of Wiederhorn's misuse of corporate funds, securities fraud, and tax evasion. On February 22, 2022, before trading hours, the Company confirmed that the investigations, which the Company first became aware of in December 2021, concerned the Company's December 2020 merger with Fog Cutter Capital Group Inc. ("FCCG"), as well as transactions between the Company, FCCG, and Mr. Wiederhorn, and compensation, extensions of credit and other benefits or payments received by Wiederhorn or his family.

5. However, the Company continued to mislead the investing public. On March 23, 2022, the Company stated in its 10-K for the 2021 fiscal year that it had reported all related person transactions since December 29, 2019. This, as later would be revealed, was false because the Company did not report the 'loans' of approximately $9.6 million from FAT Brands to FCCG in 2020.

6. The Company additionally misled investors by reassuring investors that FAT Brands was not a target of investigation by the U.S. Attorney's Office for the Central District of California.

7. On March 12, 2024, Defendants admitted that the Company was a target of ongoing investigations by the U.S. Attorney's Office. On this news, the price of FAT Brands shares dropped by $0.36, or approximately 4.69%, to close at $7.31 on March 13, 2024.

8. Then, on May 10, 2024, the U.S. Attorney's Office indicted Defendants FAT Brands and Wiederhorn in connection with, *inter alia*, the unauthorized 'loans' from FAT Brands to FCCG. That same day, the SEC also filed a complaint charging Defendants FAT Brands and Wiederhorn with misleading investors regarding the unapproved 'loans' from FAT Brands to FCCG.

9. On this news, the price of FAT Brands shares dropped $2.08, or approximately 27.7%, to close at $5.42 on May 10, 2024.

## JURISDICTION AND VENUE

10. The federal law claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

12. This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) because the alleged misstatements were made in, issued from, or entered this District and the subsequent damages took place in this District. Further, the Company maintains its principal executive offices in Los Angeles County.

14. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15. Lead Plaintiff Mitchell Kates, as set forth in his certification on file with the Court (ECF No. 1-1) and incorporated by reference herein, purchased the Company's publicly traded securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

16. Defendant FAT Brands is a Delaware corporation with its principal executive offices at 9720 Wilshire Blvd., Suite 500, Beverly Hills, California 90212. FAT Brands' Class A common stock trades on the NASDAQ exchange under the ticker symbol "FAT," its Class B common stock trades under the ticker symbol "FATBB," its Series B Cumulative Preferred Stock trades under the ticker symbol "FATBP," and its warrants trade under the ticker symbol "FATBW."

17. Defendant Andrew A. Wiederhorn ("Wiederhorn") founded the Company and served as the Company's Chief Executive Officer ("CEO") until May 5, 2023. After May 5, 2023, he continued serving as the Company's Chairman.

18. Defendant Kenneth J. Kuick ("Kuick") served as the Company's Co-CEO and Chief Financial Officer from May 1, 2023 to the present and also served as the Company's Chief Financial Officer at all relevant times.

19. Defendant Robert G. Rosen ("Rosen") served as the Company's Co-CEO from May 1, 2023 to the present.

20. Defendants Wiederhorn, Kuick and Rosen are collectively referred to herein as the "Individual Defendants."

21. The Individual Defendants:

(a) directly participated in the management of the Company;

(b) were directly involved in the day-to-day operations of the Company at the highest levels;

(c) were privy to confidential proprietary information concerning the Company and its business and operations;

(d) were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) were directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

22. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

23. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

24. The Company and the Individual Defendants are referred to herein, collectively, as "Defendants."

## ALLEGATIONS OF SECURITIES FRAUD

### Company Background

25. FAT Brands is a restaurant franchisor. Rather than owning or operating actual restaurant locations, FAT Brands purports to generate revenues primarily by charging its franchisees an initial franchise fee and ongoing royalty fees based on their sales.

26. FAT Brands' holdings include Round Table Pizza, Marble Slab Creamery, Great American Cookies, Hot Dog on a Stick, Pretzelmaker, Fazoli's, Johnny Rockets, Elevation Burger, Yalla Mediterranean, Hurricane Grill & Wings, Native Grill & Wings, and Twin Peaks.

### Andrew Wiederhorn's Background

27. In 2004, Andrew Wiederhorn pleaded guilty to two felony charges in connection with his former company, Wilshire Financial Services Group ("WFSG") and the collapse of Capital Consultants, LLC ("Capital Consultants"). Capital

Consultants was an investment advisor which lost approximately $350 million in union pension funds due to fraudulent and failed investments and set off a criminal investigation that led to charges against 11 people. Capital Consultants had loaned $160 million to WFSG before Capital Consultants collapsed in September 2000 and was seized by federal regulators.

28. As a result of the investigation and charges stemming from the Capital Consultants debacle, Wiederhorn pleaded guilty to two felonies: (1) giving an illegal gratuity to Capital Consultants CEO Jeff Grayson, who pleaded guilty to fraud charges; and (2) filing a false tax return. Wiederhorn was sentenced to 18 months in prison and was ordered to pay a $25,000 fine and $2 million in restitution to the Capital Consultants receiver.

29. The day before Wiederhorn entered into the plea deal, he signed an agreement with FCCG—then a public company under Wiederhorn's control—under which FCCG, while acknowledging the plea agreement and imminent incarceration, nonetheless provided Wiederhorn with approximately $4.75 million in benefits.

30. Wiederhorn's agreement with FCCG stated that, ***while Wiederhorn was in prison for his felony convictions:*** (1) he would retain his titles and responsibilities with FCCG; (2) he would receive his annual salary of $350,000, bonuses, and other benefits; and (3) FCCG would pay Wiederhorn a $2 million "leave of absence payment," matching precisely the amount he was ordered to pay in restitution.

31. The same year that FCCG entered into the deal with Wiederhorn, it reported a net loss of $3.93 million.

32. FCCG had also previously entered into an agreement with Wiederhorn to amend his employment contract in 2003, more than two years *after* it had known about the government investigation of Wiederhorn that led to his eventual guilty plea. Under the provisions of the 2003 amendment, if FCCG terminated

Wiederhorn without cause, it would have owed him three times his annual salary, three times his largest annual bonus from the last three years, unreimbursed business expenses, and accrued but unpaid base salary and bonuses – the equivalent of approximately $6 million as of the time of Wiederhorn's guilty plea in June 2004 – all as a lump-sum payment within ten days.

33. Before the 2003 amendment, termination "for cause" included any felony conviction other than a traffic offense. The 2003 amendment changed the relevant provision to limit the definition of a "for cause" termination of Wiederhorn to only a conviction for a felony that involved FCCG.

34. FCCG had been listed on NASDAQ, but in July 2004, NASDAQ delisted FCCG. NASDAQ determined that it was contrary to the public interest for FCCG to remain listed in light of FCCG's patently one-sided agreements with Wiederhorn, FCCG's controlling shareholder and CEO, and because Wiederhorn was not only exercising substantial influence over the company during his incarceration, but receiving handsome compensation for it.

35. The arrangement Wiederhorn concocted between FCCG and himself prompted New York Times columnist Nicholas Kristof to bestow on Wiederhorn his inaugural "award for greed," writing: "I can't think of a board that has ever so disgraced the principles of corporate governance by overpaying a CEO even as he sits in prison."

### After His Prison Term and FCCG's Delisting, Wiederhorn Turned His Eyes to FAT Brands

36. In August 2003, FCCG completed a $7 million investment and financing package for Fatburger, acquiring the remainder of the company in 2011. Wiederhorn founded and controlled FCCG as its majority shareholder. He became Fatburger's CEO in 2006 and continued to serve as FCCG's Chairman and CEO, as well as Fatburger's CEO and President.

37. In 2006, after Wiederhorn's appointment as CEO of Fatburger shortly following his release from prison, Fatburger was barred from selling additional franchises in California for several months due to Wiederhorn's felony convictions.

38. In March 2009, after borrowing approximately $3.85 million from financier General Electric Capital Business Asset Funding Corp. ("GE"), several Fatburger subsidiaries owned and operated by FCCG received notices of default and demand for payment from GE.

39. In the end, more than 30 Fatburger subsidiaries, including Fatburger Restaurants of California and Fatburger Restaurants of Nevada, were unable to repay GE and filed for Chapter 11 bankruptcy protection in April 2009. As a result of the bankruptcy proceedings, FCCG was forced to sell off many of its Fatburger restaurants at auction.

40. After the bankruptcy filings, FCCG announced that it had failed to satisfy a listing requirement of the OTC Bulletin Board, where its stock had been listed after being delisted from NASDAQ. FCCG had failed to timely file its financial reports with the SEC, and announced that it expected its stock to no longer be listed on the OTC Bulletin Board. The approximately eight million outstanding shares of FCCG common stock became worthless.

**Wiederhorn Controlled and Looted FAT Brands Through FCCG**

41. FAT Brands was formed as a Delaware corporation on March 21, 2017, for the purposes of completing the IPO, acquiring new brands, and continuing the businesses of Fatburger and Buffalo's Café which were then being conducted as subsidiaries of FCCG. As described in FAT Brands' IPO Prospectus, FCCG, as the controlling shareholder of FAT Brands, "exercised significant influence over corporate management and affairs of FAT Brands" and "controlled virtually all [FAT Brands] matters requiring stockholder approval."

42. Prior to FAT Brands' IPO, FCCG owned 100% of FAT Brands' common stock and voting power. Following the IPO, FCCG retained 80% of FAT Brands' common stock and voting power.

43. FAT Brands continued to issue similar warnings about FCCG's significant and potentially conflicting influence through at least April 2020:

> FCCG controls approximately 80% of the combined voting power of our Common Stock and will, for the foreseeable future, have significant influence over corporate management and affairs and be able to control virtually all matters requiring stockholder approval. FCCG is able to, subject to applicable law, elect a majority of the members of our Board of Directors and control actions to be taken by us, including amendments to our certificate of incorporation and bylaws and approval of significant corporate transactions, including mergers and sales of substantially all of our assets. It is possible that the interests of FCCG may in some circumstances conflict with our interests and the interests of our other stockholders.

44. At the time of the IPO, Wiederhorn was serving as President, CEO, and director of FAT Brands as well as the Chairman and CEO of FCCG. Roe, then the Senior Vice President and CFO of FAT Brands, also served as CFO of FCCG at the time of the IPO.

45. Wiederhorn began working for Berchtold when Wiederhorn was just 13 years old, later marrying Berchtold's daughter. Berchtold served as both President and COO of Fatburger as well as President and COO of FCCG. Berchtold served as Senior Vice President of WFSG, which Wiederhorn founded. Wiederhorn also served as the Chairman, CEO, Secretary, and Treasurer for WFSG. Berchtold also served as FCCG's CEO during Wiederhorn's imprisonment.

46. Wiederhorn, through FCCG, planned to conduct FAT Brands' IPO as a Regulation A+, or "Reg A+," offering. Under Title IV of the 2015 Jumpstart Our

Business Startups (JOBS) Act, a private company can raise public funding through a Reg A+ offering, which involves an expedited review process. In a Reg A+ offering, a company is required to make its offering memorandum public just 21 days prior to SEC qualification.

47. In light of Wiederhorn's felonies and prison sentence and FCCG's two prior delistings, Wiederhorn and FCCG opted to pursue a Reg A+ offering in lieu of a traditional IPO to avoid the heightened scrutiny that a traditional IPO would entail.

48. In its IPO, FAT Brands sold two million shares of its common stock to investors for $12 per share, raising $24 million in gross proceeds. FCCG retained its eight million shares and thus 80% of the voting power of FAT Brands.

49. FCCG also "contributed" its two operating subsidiaries, Fatburger and Buffalo's Café, to the Company in connection with the IPO, in exchange for a $30 million promissory note. According to the Offering Circular, the Company planned to use $10.55 million of the IPO proceeds to purchase Ponderosa and Bonanza, and to send $9.5 million of the proceeds to FCCG to partially repay the $30 million debt. After the repayment of the $9.5 million to FCCG, FAT Brands would assume a $20.5 million debt obligation to FCCG, which would carry a 10% interest rate and mature five years following the IPO.

50. The FAT Brands IPO created a liquid market through which FCCG could monetize and sell its substantial stock holdings in FAT Brands. FCCG was also entitled to the lion's share of dividends paid by FAT Brands.

51. For completing the FAT Brands IPO, Wiederhorn received a bonus of $400,000 in cash and 15,000 shares of FAT Brands common stock (which became liquid and assumed a market value of $180,000 upon the IPO), and Roe received a bonus of $300,000 cash and 15,000 shares of FAT Brands common stock.

**After FAT Brands' IPO, Wiederhorn Used**
**<u>FAT Brands as his Personal Piggy Bank</u>**

52. On June 15, 2021, two FAT Brands shareholders filed a derivative shareholder action against Andrew Wiederhorn and the other members of FAT Brands' board of directors. *Harris v. Junger*, No. 2021-0511-SG (Del. Ch.).

53. The *Harris* complaint was filed after the shareholders had reviewed internal company records pursuant to their books and records demand under §220 of the Delaware General Corporation Law. The *Harris* plaintiffs brought claims for breach of fiduciary duty, unjust enrichment, and waste of corporate assets against Wiederhorn and the other defendants. On February 11, 2022, Judge Glasscock denied the defendants' motion to dismiss the *Harris* complaint.

54. As detailed in the *Harris* complaint, in addition to using FCCG to control FAT Brands, Wiederhorn also used FCCG and FAT Brands as his personal piggy bank.

55. According to the *Harris* complaint, aside from its controlling stake in FAT Brands, FCCG held nothing of material value apart from net operating loss carryforwards ("NOLs") following the FAT Brands IPO. Those NOLs were essentially worthless because FCCG (and FAT Brands, after its subsequent merger with FCCG) had no real earnings to be taxed, and thus no taxes for the NOLs to offset. Moreover, the Company already had access to FCCG's NOLs, subject to payments under an existing tax sharing agreement between the companies, so long as FCCG owned at least 80% of the Company. FAT Brands would only be unable to use the FCCG NOLs if FCCG decided to dilute or sell off its own holdings.

56. According to the *Harris* complaint, despite FCCG's near total lack of cash flow, Wiederhorn caused FCCG to repeatedly make cash advances to Wiederhorn in the form of personal loans at a 5% interest rate. As of December 29, 2019 and December 30, 2018, the outstanding balances on FCCG's loans to Wiederhorn were $16,803,000 and $9,155,000, respectively.

57. According to the *Harris* complaint, FCCG had no other assets or cash flow, so it had to borrow from FAT Brands to fund its loans to Wiederhorn. FAT

Brands extended credit to FCCG pursuant to an Intercompany Promissory Note dated October 20, 2017, with an initial principal balance of $11,906,000. FCCG and certain of its subsidiaries received additional intercompany loans from FAT Brands in the aggregate amount of $10,523,000.

58. In April 2020, FAT Brands entered into a five-year revolving credit agreement with FCCG, with a maximum capacity of $35 million and an interest rate of 10%. The initial balance of the credit agreement was just over $21 million, including the balance of notes between the Company and FCCG, accrued and unpaid interest income, and other adjustments through December 29, 2019. As of March 29, 2020, the balance receivable under the credit agreement was nearly $27 million.

59. As the *Harris* complaint alleges, there never was a business justification for these loans. As of December 29, 2019, FCCG had total liabilities and stockholders' deficit of $32.9 million, an annual net loss of $6.2 million, and essentially no source of potential revenue apart from its holdings in FAT Brands. In fact, FCCG appears to have had no business operations, apart from its holdings in FAT Brands, since some time in 2018.

60. According to the *Harris* complaint, as a result of these loans, FAT Brands was forced to enter into an expensive financing agreement with The Lion Fund, under which the Company borrowed $20 million when it ran short of cash in 2019. The interest rate on that loan was 20% and the Company had to give The Lion Fund a lien on substantially all of its assets. Thus, the Company was effectively loaning tens of millions of dollars to Wiederhorn (through FCCG) at a 10% interest rate, but borrowing the funds at 20%, while Wiederhorn paid only 5%.

61. Wiederhorn then caused FCCG and FAT Brands to propose a merger in late 2020. Through the proposed merger transaction, the FAT Brands stock held by FCCG would be cancelled, FCCG stockholders would be issued FAT Brands common stock in the amount previously held by FCCG, and non-FCCG

stockholders of FAT Brands (including the Company's directors) would receive a special dividend of FAT Brands preferred stock.

62. In order to consolidate his control over FAT Brands and avoid dilution from the merger, on September 2, 2020, Wiederhorn caused FCCG to effectuate a 326,000-to-1 reverse stock split. FCCG stockholders owning less than one share after the reverse split were issued notes in lieu of their fractional share in the amount of $2.75 per original share. Immediately following the reverse stock split, FCCG then declared a 1-to-326,000 stock split, undoing the effects of the reverse stock split save for the elimination of smaller shareholders, and leaving Wiederhorn and his affiliates in complete control of FCCG.

63. The FAT Brands-FCCG merger was consummated on December 24, 2020 without a vote of the unaffiliated FAT Brands shareholders.

64. In the first nine months of 2020, Wiederhorn caused FCCG to forgive approximately $16.9 million of his debts to FCCG without payment, leaving a balance of approximately $5.6 million.

65. After the September 2, 2020 reverse stock split, Wiederhorn then caused FCCG to transfer a package of FAT Brands preferred stock and warrants, with a combined carrying value of $1,861,000, to a holding company owned primarily by Wiederhorn, adding that amount to Wiederhorn's debt and bringing his total outstanding loan balance to approximately $7.5 million.

66. Immediately prior to FCCG's merger with FAT Brands, Wiederhorn caused FCCG to forgive the entire balance of his debts to FCCG without payment. At that point, going into the merger, FCCG owed FAT Brands nearly $40 million through intercompany loans.

67. In sum, Wiederhorn caused FCCG to loan him tens of millions of dollars, and then caused FAT Brands to loan the money to FCCG to cover those debts. He then caused FCCG to forgive his personal loans without any repayment, and then caused the merger of FAT Brands and FCCG to dissolve the intercompany

loans. Wiederhorn walked away from the transactions with millions in his pockets and consolidated control over the Company, and the Company and its shareholders were left holding the bag.

68. According to the *Harris* complaint, the Merger left the Company hugely indebted, with nearly $100 million in debt (including operating leases). In addition, it had close to $20 million in negative working capital (a large portion of which is essentially a form of debt) and a business with negative earnings, negative cash flow, and barely enough EBITDA to meet the Company's enormous interest expenses (and not enough to pay the interest on its debt and also pay the preferred stock dividend obligations).

69. Thus, the merger left the Company on the brink of insolvency and wiped out substantially all of the Company's equity value. As a result, the Company's auditors issued a "going concern" qualification in the Company's annual report for 2020.

70. In 2020, the Company reported a net loss of $14.9 million. In 2021, the Company reported a net loss of $31.6 million.

**Defendants Made False and Misleading Statements and Omissions of Material Fact During the Class Period**

71. On March 23, 2022, FAT Brands filed with the SEC its annual report for the fiscal year ended December 26, 2021 on Form 10-K ("2021 Annual Report"), which was signed by Defendants Wiederhorn and Kuick. Attached to the 2021 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Wiederhorn and Kuick attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

72. The 2021 Annual Report stated, in part, the following concerning related party transactions:

"Since December 29, 2019, the Company has engaged in certain transactions with Fog Cutter Capital Group Inc., which, prior to December 24, 2020, was the 81.5% parent of the Company. Descriptions of such transactions are included under Notes 3, 10, 12, 13, 15 and 19 to the audited consolidated financial statements of the Company included under Item 15 of this Form 10-K, which information is incorporated herein by this reference. In addition, certain family members of Andrew Wiederhorn are employed by the Company, as discussed above under "Part III, Item 10. Directors, Executive Officers and Corporate Governance / Family Relationships." ***Other than such transactions, since December 29, 2019, there has not been, nor is there currently proposed, any transaction or series of similar transactions to which we were or will be a party:***

- ***in which the amount involved exceeds $120,000; and***
- ***in which any director, executive officer, shareholder who beneficially owns 5% or more of our common stock or any member of their immediate family had or will have a direct or indirect material interest."***

* * *

**NOTE 15. RELATED PARTY TRANSACTIONS**

Subsequent to the Merger with FCCG on December 24, 2020 (Note 3), there have been no reportable related party transactions with non-consolidated related entities.

Prior to the Merger, the Company reported the following related party transactions:

*Due from Affiliates*

On April 24, 2020, the Company entered into an Intercompany Revolving Credit Agreement with FCCG ("Intercompany Agreement"). The Company had previously extended credit to FCCG pursuant to a certain Intercompany Promissory Note (the "Original Note"), dated October 20, 2017, with an initial principal balance of $11.9 million. Subsequent to the issuance of the Original Note, the Company and certain of its direct or indirect subsidiaries made additional intercompany advances. Pursuant to the Intercompany

> Agreement, the revolving credit facility was subject to an interest at a rate of 10.0% per annum, had a five-year term with no prepayment penalties, and had a maximum capacity of $35.0 million. All additional borrowings under the Intercompany Agreement were subject to the approval of the Board of Directors, in advance, on a quarterly basis and were subject to other conditions as set forth by the Company. The initial balance under the Intercompany Agreement totaled $21.1 million including the balance of the Original Note, borrowings subsequent to the Original Note, accrued and unpaid interest income, and other adjustments through December 29, 2019. Effective with the Merger with FCCG, the Intercompany Agreement was terminated and intercompany balances were eliminated in consolidation."

(Emphasis added.)

73. The statements in ¶72 were false and/or misleading at the time they were made because they did not disclose the approximately $9.6 million in 'loans' FAT Brands made to FCCG without prior board approval in 2020. The majority, if not all, of these loans were used by Defendant Wiederhorn for his personal benefit instead of legitimate business expenses for FCCG. Indeed, as the mastermind orchestrating the illicit self-dealing payments, Defendant Wiederhorn knew the truth behind the undisclosed illicit payments, including the Company's role in the transactions. As the CEO, his scienter is imputed to the Company.

74. The 2021 Annual Report also stated, in pertinent part, the following concerning the on-going governmental investigations into the Company, FCCG, and Defendant Wiederhorn:

> "Government Investigations
>
> The U.S. Attorney's Office for the Central District of California (the "U.S. Attorney") and the U.S. Securities and Exchange Commission informed the Company in December 2021 that they have opened ***investigations relating to the Company and our Chief Executive Officer, Andrew Wiederhorn, and are formally seeking documents and materials concerning, among other things, the Company's December 2020 merger with Fog Cutter Capital Group Inc., transactions between these entities and Mr. Wiederhorn, and***

> ***compensation, extensions of credit and other benefits or payments received by Mr. Wiederhorn or his family. The Company is cooperating with the government regarding these matters, and we believe that the Company is not currently a target of the U.S. Attorney's investigation.*** At this early stage, the Company is not able to reasonably estimate the outcome or duration of the government investigations."

(Emphasis added.)

75. The statements in ¶74 were false and/or misleading at the time they were made because, despite allegedly "cooperating with the government" regarding the investigation, the Company assured investors that the Company was not the target of the investigation. If the Company was indeed responding to the government's requests for documents and materials concerning transactions between FAT Brands, FCCG, and Defendant Wiederhorn, Defendants should have known, or were reckless in not knowing, that FAT Brands was a target of the investigation for its role in funneling money from investors to Defendant Wiederhorn's pocket. Therefore, the Company misled the investing public by stating that the Company was not a target of the investigation, when Defendants knew or were reckless in not knowing that FAT Brands was one of the targets of the investigation. Alternatively, Defendants misled investors by stating that the Company was cooperating with the governmental investigation, when in truth they were not cooperating. In addition, Defendant Wiederhorn, as the mastermind orchestrating the illicit self-dealing payments, knew the truth behind the government investigations, including the Company's role in the transactions. As the CEO, his scienter is imputed to the Company.

76. On November 14, 2022, FAT Brands filed with the SEC a Form 424B5 Prospectus Supplement to the Prospectus dated February 8, 2022 (the "November 2022 Prospectus"). The November 2022 Prospectus offered shares of FAT Brands' Class A common stock and Series B Cumulative Preferred Stock for an aggregate

offering price of up to $21,435,000. The shares were sold to or through ThinkEquity as the sole underwriter.

77. The November 2022 Prospectus contained a "Risk Factors" section purporting to warn investors about the risks in participating in the offering. The Risk Factors included, in relevant part, a warning concerning FCCG's control of FAT Brands. The November 2022 Prospectus stated, in pertinent part:

> "***We are controlled by Fog Cutter Holdings LLC, whose interests may differ from those of our public stockholders.***
>
> Fog Cutter Holdings LLC, which is controlled by our President and Chief Executive Officer, Andrew Wiederhorn, controls approximately 55.5% of the voting power of our Class A Common Stock and Class B Common Stock (which we refer to together as our "Common Stock") collectively, and as such, Fog Cutter Holdings LLC has significant influence over our corporate management and affairs, and is able to control virtually all matters requiring stockholder approval, including the election of directors and significant corporate transactions. It is possible that the interests of Fog Cutter Holdings LLC may, in some circumstances, conflict with our interests and the interests of our other stockholders."

78. The Risk Factors were misleading because they did not warn about the fact that Defendant Wiederhorn had been looting the Company by making unauthorized cash transfers from FAT Brands to FCCG, himself, and his family. The Risk Factors merely warned of the possibility of conflicting interests, when in fact Defendant Wiederhorn had already been stealing from the Company for years. Furthermore, the November 2022 Prospectus incorporated by reference the 2021 Annual Report. Therefore, the November 2022 Prospectus contained false and/or misleading statements and/or omissions for the same reasons as set forth in ¶¶72-75.

79. On February 24, 2023, FAT Brands filed with the SEC its annual report for the fiscal year ended December 25, 2022 on Form 10-K ("2022 Annual

Report"), which was signed by Defendants Wiederhorn and Kuick. Attached to the 2022 Annual Report were SOX certifications signed by Defendants Wiederhorn and Kuick attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

80. The 2022 Annual Report stated the following concerning the on-going governmental investigations into the Company, FCCG, and Defendant Wiederhorn:

> "Government Investigations
>
> In December 2021, the U.S. Attorney's Office for the Central District of California (the "U.S. Attorney") and the U.S. Securities and Exchange Commission (the "SEC") informed the Company that they had ***opened investigations relating to the Company and our Chief Executive Officer, Andrew Wiederhorn, and were formally seeking documents and materials concerning, among other things, the Company's December 2020 merger with Fog Cutter Capital Group Inc., transactions between those entities and Mr. Wiederhorn, as well as compensation, extensions of credit and other benefits or payments received by Mr. Wiederhorn or his family from those entities. Our Board of Directors has formed a Special Review Committee (the "SRC") comprised of directors other than Mr. Wiederhorn to oversee a review of the issues raised by the U.S. Attorney and SEC investigations***, reach findings and make a recommendation to the Board with respect to these matters. The SRC is authorized to review such documents and interview such persons, and retain legal counsel and other consultants on behalf of the Company, as the SRC deems necessary or appropriate to complete its review. ***The Company intends to cooperate with the U.S. Attorney and the SEC regarding these matters and is continuing to actively respond to inquiries and requests from the U.S. Attorney and the SEC. We believe that the Company is not currently a target of the U.S. Attorney's investigation.*** At this stage, we are not able to reasonably estimate or predict the outcome or duration of either of the U.S. Attorney's or the SEC's investigations."

(Emphasis added.)

81. The statements in ¶80 were false and/or misleading at the time they were made because, despite allegedly "intend[ing] to cooperate" with the government and "actively respond[ing] to the inquiries and requests", the Company assured investors that the Company was not the target of the investigation. If the Company was indeed actively responding to the government's inquiries and requests for documents and materials concerning transactions between FAT Brands, FCCG, and Defendant Wiederhorn, Defendants should have known, or were reckless in not knowing, that FAT Brands was a target of the investigation for its role in funneling money from investors to Defendant Wiederhorn's wallet. Therefore, the Company misled the investing public by stating that the Company was not a target of the investigation, when Defendants knew or were reckless in not knowing that FAT Brands was one of the targets of the investigation. Alternatively, Defendants misled investors by stating that the Company was cooperating with the governmental investigation, when in truth they were not cooperating. Furthermore, Defendant Wiederhorn, as the mastermind orchestrating the illicit self-dealing payments, knew the truth behind the government investigations, including the Company's role in the transactions. As the CEO, his scienter is imputed to the Company.

82. Additionally, the statements in ¶80 were false and/or misleading when made because the Special Review Committee was only created to provide an illusion of self-governance and cooperation with the governmental investigations. In truth, the group held little to no actual power and would take no meaningful action before Defendant Wiederhorn disbanded the group in a few months' time.

83. Indeed, on April 3, 2023, FAT Brands filed a form 8-K announcing that certain directors – mainly independent directors – had been removed and replaced with Weiderhorn's family members and other loyalists. In relevant part, the announcement said:

> "On March 28, 2023, the holder of a majority of the voting power of the outstanding voting stock of FAT Brands Inc. (the "Company") ***took action to remove the following directors of the Company*** pursuant to Section 141(k) of the Delaware General Corporation Law and Section 5.04 of the Company's Certificate of Incorporation: ***Kenneth Anderson, Lynne Collier, Amy Forrestal***, James Neuhauser and ***Edward Rensi*** [. . .] and appointed the following individuals to fill vacancies on the Board: Donald Berchtold, Tyler Child, Kenneth Kepp, Carmen Vidal, Mason Wiederhorn, Taylor Wiederhorn and Thayer Wiederhorn. [. . .] Andrew Wiederhorn (Chairman), Mason Wiederhorn, Taylor Wiederhorn and Thayer Wiederhorn."

(Emphasis added.)

84. Despite announcing the firing of all independent directors, the announcement did not speak as to the fate of the Special Review Committee. It wasn't until the next quarterly report that the Company would reveal that the Special Review Committee, after nearly 7 months, was disbanded without any meaningful actions or findings.

85. Furthermore, Defendant Wiederhorn appointed himself as the chairman and replaced the independent directors with those who would be loyal to him, including three of his children, further evincing a lack of intent to cooperate with the then-ongoing governmental investigations.

86. On May 9, 2023, FAT Brands filed with the SEC its quarterly report for the fiscal quarter ended March 26, 2023, on Form 10-Q ("1Q 2023 10-Q"), which was signed by Defendant Kuick. Attached to the 1Q 2023 10-Q were SOX certifications signed by Defendants Kuick and Rosen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

87. The 1Q 2023 10-Q stated the following regarding the on-going governmental investigations into the Company, FCCG, and Defendant Wiederhorn:

> "Government Investigations

> In December 2021, the U.S. Attorney's Office for the Central District of California (the "U.S. Attorney") and the U.S. Securities and Exchange Commission (the "SEC") informed the Company that they had ***opened investigations relating to the Company and our former Chief Executive Officer, Andrew Wiederhorn, and were formally seeking documents and materials concerning, among other things, the Company's December 2020 merger with Fog Cutter Capital Group Inc., transactions between those entities and Mr. Wiederhorn, as well as compensation, extensions of credit and other benefits or payments received by Mr. Wiederhorn or his family from those entities. From August 23, 2022 until March 28, 2023, our Board of Directors maintained a Special Review Committee (the "SRC") comprised of directors other than Mr. Wiederhorn to oversee a review of the issues raised by the U.S. Attorney and SEC investigations. The Company intends to cooperate with the U.S. Attorney and the SEC regarding these matters and is continuing to actively respond to inquiries and requests from the U.S. Attorney and the SEC. We believe that the Company is not currently a target of the U.S. Attorney's investigation.*** At this stage, we are not able to reasonably estimate or predict the outcome or duration of either of the U.S. Attorney's or the SEC's investigations."

(Emphasis added.)

88. The statements in ¶87 were false and/or misleading at the time they were made because, despite allegedly "intend[ing] to cooperate" with the government and "actively respond[ing] to the inquiries and requests" for documents and materials, the Company assured investors that the Company was not the target of the investigation. If the Company was indeed actively responding to the government's inquiries and requests for documents and materials concerning transactions between FAT Brands, FCCG, and Defendant Wiederhorn, Defendants should have known, or were reckless in not knowing, that FAT Brands was a target of the investigation for its role in funneling money from investors to Defendant Wiederhorn's wallet. Therefore, the Company misled the investing public by stating that the Company was not a target of the investigation, when Defendants knew or

were reckless in not knowing that FAT Brands was one of the targets of the investigation. Alternatively, Defendants misled investors by stating that the Company was cooperating with the governmental investigation, when in truth they were not cooperating. In addition, Defendant Wiederhorn, as the mastermind orchestrating the illicit self-dealing payments, knew the truth behind the government investigations, including the Company's role in the transactions. Furthermore, Defendants Kuick and Rosen had a duty under GAAP to conduct a reasonable investigation of the facts within the Company's possession, including interviewing personnel, clients and business associates and reviewing its records. If Defendants Kuick and Rosen had carried out their duties, they would have discovered the illicit payments from FAT Brands to FCCG and Defendant Wiederhorn. Therefore, Defendants Kuick and Rosen knew, or were reckless in not knowing, the truth concerning the illicit payments and the Company's liability concerning such payments.

89. On August 4, 2023, FAT Brands filed with the SEC its quarterly report for the fiscal quarter ended June 25, 2023, on Form 10-Q ("2Q 2023 10-Q"), which was signed by Defendant Kuick. Attached to the 2Q 2023 10-Q were SOX certifications signed by Defendants Kuick and Rosen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

90. The 2Q 2023 10-Q stated the following regarding the on-going governmental investigations into the Company, FCCG, and Defendant Wiederhorn:

> "Government Investigations
>
> In December 2021, the U.S. Attorney's Office for the Central District of California (the "U.S. Attorney") and the U.S. Securities and Exchange Commission (the "SEC") informed the Company that they had ***opened investigations relating to the Company and our former Chief Executive Officer, Andrew Wiederhorn, and were formally seeking documents and materials concerning, among other things,***

> ***the Company's December 2020 merger with Fog Cutter Capital Group Inc., transactions between those entities and Mr. Wiederhorn, as well as compensation, extensions of credit and other benefits or payments received by Mr. Wiederhorn or his family from those entities.*** From August 23, 2022 until March 28, 2023, our Board of Directors maintained a Special Review Committee (the "SRC") comprised of directors other than Mr. Wiederhorn to oversee a review of the issues raised by the U.S. Attorney and SEC investigations. ***The Company intends to cooperate with the U.S. Attorney and the SEC regarding these matters and is continuing to actively respond to inquiries and requests from the U.S. Attorney and the SEC. We believe that the Company is not currently a target of the U.S. Attorney's investigation.*** At this stage, we are not able to reasonably estimate or predict the outcome or duration of either of the U.S. Attorney's or the SEC's investigations."

(Emphasis added.)

91. The statements in ¶90 were false and/or misleading at the time they were made because, despite allegedly "intend[ing] to cooperate" with the government and "actively respond[ing] to the inquiries and requests" for documents and materials, the Company assured investors that the Company was not the target of the investigation. If the Company was indeed actively responding to the government's inquiries and requests for documents and materials concerning transactions between FAT Brands, FCCG, and Defendant Wiederhorn, Defendants should have known, or were reckless in not knowing, that FAT Brands was a target of the investigation for its role in funneling money from investors to Defendant Wiederhorn's wallet. Therefore, the Company misled the investing public by stating that the Company was not a target of the investigation, when Defendants knew or were reckless in not knowing that FAT Brands was one of the targets of the investigation. Alternatively, Defendants misled investors by stating that the Company was cooperating with the governmental investigation, when in truth they were not cooperating. In addition, Defendant Wiederhorn, as the mastermind

orchestrating the illicit self-dealing payments, knew the truth behind the government investigations, including the Company's role in the transactions. As the CEO, his scienter is imputed to the Company. Furthermore, Defendants Kuick and Rosen had a duty under GAAP to conduct a reasonable investigation of the facts within the Company's possession, including interviewing personnel, clients and business associates and reviewing its records. If Defendants Kuick and Rosen had carried out their duties, they would have discovered the illicit payments from FAT Brands to FCCG and Defendant Wiederhorn. Therefore, Defendants Kuick and Rosen knew, or were reckless in not knowing, the truth concerning the illicit payments and the Company's liability concerning such payments.

92. On October 31, 2023, FAT Brands filed with the SEC its quarterly report for the fiscal quarter ended September 24, 2023, on Form 10-Q ("3Q 2023 10-Q"), which was signed by Defendant Kuick. Attached to the 3Q 2023 10-Q were SOX certifications signed by Defendants Kuick and Rosen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

93. The 3Q 2023 10-Q stated the following regarding the on-going governmental investigations into the Company, FCCG, and Defendant Wiederhorn:

> "Government Investigations
>
> In December 2021, the U.S. Attorney's Office for the Central District of California (the "U.S. Attorney") and the U.S. Securities and Exchange Commission (the "SEC") informed the Company that they had ***opened investigations relating to the Company and our former Chief Executive Officer, Andrew Wiederhorn, and were formally seeking documents and materials concerning, among other things, the Company's December 2020 merger with Fog Cutter Capital Group Inc., transactions between those entities and Mr. Wiederhorn, as well as compensation, extensions of credit and other benefits or payments received by Mr. Wiederhorn or his family from those entities.*** From August 23, 2022 until March 28, 2023, our Board of Directors maintained a Special Review Committee (the "SRC")

comprised of directors other than Mr. Wiederhorn to oversee a review of the issues raised by the U.S. Attorney and SEC investigations. ***The Company intends to cooperate with the U.S. Attorney and the SEC regarding these matters and is continuing to actively respond to inquiries and requests from the U.S. Attorney and the SEC. We believe that the Company is not currently a target of the U.S. Attorney's investigation.*** At this stage, we are not able to reasonably estimate or predict the outcome or duration of either of the U.S. Attorney's or the SEC's investigations."

(Emphasis added.)

94. The statements in ¶93 were false and/or misleading at the time they were made because, despite allegedly "intend[ing] to cooperate" with the government and "actively respond[ing] to the inquiries and requests" for documents and materials, the Company assured investors that the Company was not the target of the investigation. If the Company was indeed actively responding to the government's inquiries and requests for documents and materials concerning transactions between FAT Brands, FCCG, and Defendant Wiederhorn, Defendants should have known, or were reckless in not knowing, that FAT Brands was a target of the investigation for its role in funneling money from investors to Defendant Wiederhorn's wallet. Therefore, the Company misled the investing public by stating that the Company was not a target of the investigation, when Defendants knew or were reckless in not knowing that FAT Brands was one of the targets of the investigation. Alternatively, Defendants misled investors by stating that the Company was cooperating with the governmental investigation, when in truth they were not cooperating. In addition, Defendant Wiederhorn, as the mastermind orchestrating the illicit self-dealing payments, knew the truth behind the government investigations. As the CEO, his scienter is imputed to the Company. Furthermore, Defendants Kuick and Rosen had a duty under GAAP to conduct a reasonable investigation of the facts within the Company's possession, including

interviewing personnel, clients and business associates and reviewing its records. If Defendants Kuick and Rosen had carried out their duties, they would have discovered the illicit payments from FAT Brands to FCCG and Defendant Wiederhorn. Therefore, Defendants Kuick and Rosen knew, or were reckless in not knowing, the truth concerning the illicit payments and the Company's liability concerning such payments.

**<u>Defendants Slowly Reveal the Truth</u>**

95. On March 12, 2024, FAT Brands filed with the SEC its annual report for the fiscal year ended December 31, 2023 on Form 10-K ("2023 Annual Report"), which was signed by Defendants Kuick and Rosen. Attached to the 2023 Annual Report were SOX certifications signed by Defendants Kuick and Rosen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

96. The 2023 Annual Report stated the following concerning the on-going governmental investigations into the Company, FCCG, and Defendant Wiederhorn:

> "Government Investigations
>
> In December 2021, the U.S. Attorney's Office for the Central District of California (the "U.S. Attorney") and the U.S. Securities and Exchange Commission (the "SEC") informed the Company that they had ***opened investigations relating to the Company and our former Chief Executive Officer, Andrew Wiederhorn, and were formally seeking documents and materials concerning, among other things, the Company's December 2020 merger with Fog Cutter Capital Group Inc., transactions between those entities and Mr. Wiederhorn, as well as compensation, extensions of credit and other benefits or payments received by Mr. Wiederhorn or his family from those entities prior to the merger.*** From August 23, 2022 until March 28, 2023, our Board of Directors maintained a Special Review Committee comprised of directors other than Mr. Wiederhorn to oversee a review of the issues raised by the U.S. Attorney and SEC investigations. ***The***

> ***Company intends to cooperate with the U.S. Attorney and the SEC regarding these matters and is continuing to actively respond to inquiries and requests from the U.S. Attorney and the SEC.*** At this stage, we are not able to reasonably estimate or predict the outcome or duration of either of the U.S. Attorney's or the SEC's investigations.
>
> On February 15, 2024, the Company, Andrew Wiederhorn and one current and one former officer of the Company each received a "Wells Notice" from the Staff of the SEC. The Wells Notice issued to the Company alleges violations of Securities Act Section 17(a)(2), and Exchange Act Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B), 13(k), and 14(a) and Rules 10b-5(b), 12b-20, 13a-1, 13a-13, 14a-3, and 14a-9 thereunder, relating solely to conduct occurring during or prior to fiscal year 2020. A Wells Notice is neither a formal charge of wrongdoing nor a determination that the recipient has violated any law. ***The Company is continuing its efforts to cooperate with the SEC and maintains that its actions were appropriate, and intends to pursue the Wells Notice process, including submitting a formal response to the SEC.***"
>
> (Emphasis added.)

97. Noticeably missing from the 2023 Annual Report was the language included in all the prior quarterly and annual filings: "We believe that the Company is not currently a target of the U.S. Attorney's investigation." After over two years of allegedly responding to the inquiries and requests from the U.S. Attorney and the SEC, the Company for the first time admitted that it was the target of the investigation.

98. On this news, the price of FAT Brands shares dropped by $0.36, or approximately 4.69%, to close at $7.31 on March 13, 2024.

99. However, FAT Brands shares continued to trade at artificially inflated prices because the Company continued to mislead the public by doubling down and assuring investors that the Company's "actions were appropriate." The statements in ¶96 were false and/or misleading when made because the Defendants knew, or were reckless in not knowing, that the numerous 'loans' from FAT Brands to FCCG

and Defendant Wiederhorn were not "appropriate." The unapproved 'loans' in 2020, which the Company still had not disclosed to the public, violated the Intercompany Revolving Credit Agreement ("IRCA"), created on or about April 14, 2020. Under the terms of the IRCA, any additional loans from defendant FAT Brands to FCCG were subject to the approval of Defendant FAT Brands' board of directors in advance on a quarterly basis. Furthermore, Defendants Kuick and Rosen had a duty under GAAP to conduct a reasonable investigation of the facts within the Company's possession, including interviewing personnel, clients and business associates and reviewing its records. If Defendants Kuick and Rosen had carried out their duties, they would have discovered the illicit payments from FAT Brands to FCCG and Defendant Wiederhorn. Therefore, Defendants Kuick and Rosen knew, or were reckless in not knowing, the truth concerning the illicit payments and the Company's liability concerning such payments.

100. The truth was fully exposed on May 10, 2024, when the U.S. Attorney's Office for the Central District of California issued a press release announcing the indictment of, *inter alia*, Defendants FAT Brands and Wiederhorn (the "Indictment").

101. According to the Indictment, Defendant Wiederhorn, with the help of co-conspirators, violated federal laws designed to protect investors and "misrepresented and concealed the true nature of the payments from defendant FAT's Board, its independent auditors, its minority shareholders, the [SEC], and the broader investing public[.]"

102. The Indictment stated that Defendant FAT Brands was required to disclose, pursuant to Item 404 of SEC Regulation S-K, "any transaction, since the beginning of the registrant's last fiscal year . . . in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

103. The Indictment also stated that Defendant Wiederhorn circumvented the terms of the IRCA to cause FAT Brands to distribute to FCCG sums that exceeded the amounts authorized by FAT Brands' board. In the second quarter 2020, FAT Brands advanced approximately $304,531 over the approved limit to FCCG. In the third quarter 2020, FAT Brands made disbursements to FCCG approximately $2,762,679 over the approved limit. In the fourth quarter of 2020, FAT Brands made an additional $3,133,891 disbursement to FCCG. The majority of these disbursements personally enriched Defendant Wiederhorn.

104. Also on May 10, 2024, the SEC announced that it had filed charges against, in relevant part, Defendants FAT Brands and Wiederhorn for defrauding investors (the "SEC Complaint").

105. The SEC Complaint charged FAT Brands and Wiederhorn with funneling approximately $9.6 million from FAT Brands to FCCG and, ultimately, Defendant Wiederhorn. This amount represented approximately 53% of FAT Brands' revenue for that year.

106. On this news, the price of FAT Brands shares dropped $2.08, or approximately 27.7%, to close at $5.42 on March 10, 2024.

**<u>Defendants Made False and Misleading Omissions and Violated GAAP</u>**

107. Defendants had a duty to disclose the material related party transactions that the Company engaged in by making millions of dollars in payments to Wiederhorn to cover credit card purchases made for Wiederhorn's and his family's personal benefit, and by "round-tripping" Company funds and incurring transaction fees through accounts owned by Thayer Wiederhorn for the purpose of fraudulently generating millions of credit card rewards points for Andrew Wiederhorn's personal benefit. Defendants violated their duty when they failed to disclose those transactions, rendering their statements false and misleading.

108. Defendants' duty to disclose the related party transactions arose out of two independent bases: under Item 404(a) of the SEC's Regulation S-K, and under U.S. Generally Accepted Accounting Principles ("GAAP").

***Defendants Violated Their Duty to Disclose Under Item 404(a)***

109. Item 404(a) of Regulation S-K (17 C.F.R. § 229.404) requires the disclosure of "any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

110. Item 404(a) requires the disclosure of (a) the name of the related party and the basis of the relation; (b) the related party's interest in the transaction, including the related party's relationship with an entity that is a party to, or has an interest in, the transaction; (c) the approximate dollar value of the transaction; (d) the approximate dollar value of the related party's interest in the transaction; and (e) any other material information regarding the transaction or the related party in light of the circumstances of the transaction.

111. The Instructions to Item 404(a) define the term "related person" to include: "[a]ny director or executive officer of the registrant" and "[a]ny immediate family member of a director or executive officer … which means any child, stepchild, parent, stepparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law."

112. The majority of the $9.6 million cash advances in 2020 from FAT Brands to FCCG went to Defendant Wiederhorn's pockets.

113. The 2021 Annual Report was misleading because Defendant Wiederhorn was a related party to FAT Brands and, in accordance with Item 404(a), FAT Brands was required to, but did not, disclose its material transactions with Defendant Wiederhorn including (a) the name of the related party and the basis of the relation; (b) the related party's interest in the transaction, including the related

party's relationship with an entity that is a party to, or has an interest in, the transaction; (c) the approximate dollar value of the transaction; (d) the approximate dollar value of the related party's interest in the transaction; and (e) any other material information regarding the transaction or the related party in light of the circumstances of the transaction.

### ***Defendants Violated Their Duty to Disclose Related Party Transactions Under GAAP***

114. GAAP also required the Company to disclose all material related party transactions.

115. GAAP constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

116. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). FASB maintains the Accounting Standards Codification ("ASC"), which is the authoritative source of GAAP in US accounting practices.

117. SEC, NYSE, and NASDAQ rules and regulations require that publicly traded companies such as FAT Brands include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X.

118. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

119. Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants Professional Standards, vol. 1, AU § 110.03 (1998), provides as follows:

> The financial statements are management's responsibility … Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. … Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

120. ASC 850, Related Parties, provides that a public company's "[f]inancial statements shall include disclosures of material related party transactions." ASC 850-10-50-1.

121. "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families." ASC 850-10-50-3.

122. Disclosures of related party transactions shall include: (a) the nature of the relationship involved, (b) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements, (c) the dollar amount of transactions for each of the periods for which income statements are presented, and (d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. ASC 850-10-50-1.

123. Defendant Wiederhorn was a related party of FAT Brands as he was an executive officers (*i.e.*, management) of the Company. ASC 850-10-50-3.

124. The Company's transactions with Defendant Wiederhorn were material, as they comprised approximately $9.6 million, or approximately 53% of FAT Brands' revenue, in 2020.

125. The 2021 Annual Report contained financial statements for FAT Brands that purported to be presented "in conformity with accounting principles generally accepted in the United States of America" (*i.e.*, GAAP).

126. The 2021 Annual Report was materially false and misleading because it violated GAAP, in that Defendant Wiederhorn was a related party to FAT Brands and, in accordance with GAAP, FAT Brands was required to, but did not, disclose its material transactions with Defendant Wiederhorn, including: (a) a description of the transactions for each period for which income statements are presented and such other information necessary to an understanding of the effects of the transactions on the financial statements; (b) the dollar amount of transactions for each of the periods for which income statements are presented; and (c) amounts due from or to the companies as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. See ASC 850-10-50-1.

***Defendants Violated Their Duty to Disclose Contingent Losses Under GAAP***

127. Furthermore, GAAP dictates that FAT Brands was required to disclose a loss contingency associated with the SEC and DOJ investigations at the beginning of the Class Period. Pending or threatened litigation and actual or possible claims and assessments, including those by the government, are examples of loss contingencies. ASC 450-20-05-10. Under certain circumstances, GAAP requires that a company disclose a loss contingency; and under certain circumstances, GAAP also requires that a company accrue a charge to income on its financial statements associated with the loss contingency.

128. The Company's financial statements throughout the Class Period violated U.S. GAAP because they failed to either recognize a probable loss from a loss contingency, or, alternatively, to at least disclose that such loss was reasonably possible, its nature, and the amount or range of such loss, in the minimum amount of the self-dealing payments Wiederhorn caused FAT Brands to pay to FCCG and, eventually, himself.

129. SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

130. Accounting Standard Codification ("ASC") 450 codifies GAAP regarding "loss contingencies." A loss contingency is an existing condition, situation, or set of circumstances involving uncertainty as to a possible loss that will be resolved when one or more future events occurs or fails to occur. See ASC 450-20-20. Loss contingencies include (i) actual or possible claims and (ii) pending or threatened litigation. See ASC 450-20-05-10.

131. Under GAAP, an issuer must disclose a material loss contingency—such as the liability resulting from FAT Brands' unauthorized payments to FCCG and IRCA violations—if a loss is at least reasonably possible. A loss is considered "reasonably possible" when the chance of the future event or events occurring is more than remote but less than likely. A loss is considered "remote" when the chance of the future event or events occurring is slight. Additionally, an issuer must record an accrual for a material loss contingency, as a charge against income in its financial statements, if a loss is probable and reasonably estimable. See ASC 450-20-25-2.

132. ASC 450-20-20 uses the terms probable, reasonably possible, and remote to identify three areas within that range, as follows:

a. Probable. The future event or events are likely to occur.

b. Reasonably possible. The chance of the future event or events occurring is more than remote but less than likely.

c. Remote. The chance of the future event or events occurring is slight.

133. An accounting industry rule of thumb holds that: (i) an event that has a less than 10% chance of occurring is considered “remote”; (ii) an event that has between a 10% and 50% chance of occurring is considered “reasonably possible”, and (iii) an event that has a greater than 50% chance of occurring is considered “probable”.

134. Examples of loss contingencies include pending or threatened litigation and actual or possible claims and assessments. ASC 450-20-05-10. Actual or possible claims and assessments include those imposed by governmental entities.

135. An estimated loss from a loss contingency shall be accrued by a charge to income if (i) it is probable that an asset has been impaired or a liability has been incurred as of the date of the financial statements and (ii) the amount of the loss can be reasonably estimated. ASC 450-20-25-2.

136. If some amount within a range of loss appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued. Even though the minimum amount in the range is not necessarily the amount of loss that will be ultimately determined, it is not likely that the ultimate loss will be less than the minimum amount. ASC 450-20-30-1. Disclosure of an additional amount of exposure to loss is required if there is a reasonable possibility that the additional loss will be incurred. ASC 450-20-30-1; ASC 450-20-50-3b. Loss contingencies that do not meet both criteria for recognition (i.e., probable and estimable) still need to be disclosed in the financial statements when the loss contingency is reasonably possible. ASC 450.

137. The requirement that an accrual be “reasonably estimated” shall not delay accrual of a loss until only a single amount can be reasonably estimated. To

the contrary, when it is probable that an asset has been impaired or a liability has been incurred, and information available indicates that the estimated amount of loss is within a range of amounts, it follows that some amount of loss has occurred and can be reasonably estimated. Thus, when a reasonable estimate of a loss contingency is a range, the loss can be reasonably estimated and an amount shall be accrued for the loss. ACS 450-20-25-5.

138. If there is at least a reasonable possibility that a loss may have been incurred (i.e., the possibility of a loss is more than "remote"), ASC 450 requires the issuer to disclose "the nature of the contingency" and "an estimate of the possible loss or range of loss or a statement that such an estimate cannot be made." ASC 450-20-50-3. If there has been no manifestation by a potential claimant of an awareness of a possible claim, disclosure is still required if (i) it is considered probable that a claim will be asserted, and (ii) there is a reasonable possibility that the outcome will be unfavorable. ASC 450-20-50-6.

139. In evaluating whether a loss contingency is reasonably probable, possible or remote, a company has a duty to conduct a reasonable investigation of the facts within its possession, including interviewing personnel, clients and business associates and reviewing its records. A company must also review its records and obtain facts to reasonably estimate the amount of a contingent liability. Defendants' statutorily imposed obligation to keep accurate books and records concerning the transactions implicated by the SEC and DOJ investigations also required Defendants to evaluate the amount of the illicit cash transfers. *See* 15 U.S.C. 7241; 17 CFR 240.13a-15(f).

140. Because GAAP requires a company to account for contingent liabilities, it imposes an obligation on a company's management to make assessments in connection with the company's financial reporting as to whether contingent liabilities exist and whether they require accrual, disclosure or both. This, in turn, requires management to evaluate evidence that is reasonably available to

them to assess the probabilities associated with the contingent liability accounting requirements.

141. Each reporting period, ASC 450 requires the company to make a reasonable investigation, including evaluating any new relevant facts, to determine (i) whether the government has manifested an awareness of a possible claim, or (ii) whether the likelihood of a future claim is probable, and (iii) the likely outcome of such a claim. See ASC-450-20-25-7; ASC-450-10-60-1. FAT Brands was required to perform that analysis each quarterly and annual reporting period, and consider each new fact in its possession in estimating its contingent liabilities resulting from its unauthorized cash transfers from FAT Brands to FCCG and, ultimately, Defendant Wiederhorn.

142. Defendant Wiederhorn, as the mastermind behind the illicit transactions, knew the truth about the self-dealing payments and the Company's role in said payments. Defendant Wiederhorn, as the mastermind behind the numerous unauthorized cash transfers, knew the true nature of the self-dealing payments. Indeed, he took steps to obfuscate the true nature of the payments. By the time the SEC and DOJ investigations began, Defendant Wiederhorn knew the liability he and the Company faced as a result of his actions.

143. Furthermore, had Defendants Kuick and Rosen performed a reasonable investigation as GAAP required, as discussed below, they would have learned of the illicit self-dealing payments that Defendant Wiederhorn orchestrated.

144. The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. 210.10-01], which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, the disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

145. Defendants were aware at all times: (1) that Defendant Wiederhorn, through FAT Brands, transferred millions of dollars to himself and his family; (2) it was probable that these violations would result in a material loss to FAT Brands; and (iii) of the dollar the amount of illicit payments the Company made to Wiederhorn, and could thus reasonably estimate the amount of that loss as soon as the DOJ and SEC had manifested an awareness of a possible claim against FAT Brands as part of its investigation. Defendants were obligated under ASC 450 to record a contingent liability on FAT Brands' balance sheet, and a charge to income on the income statement, in the minimum amount of the value of the unauthorized cash transfers.

146. Alternatively, for each quarterly and annual reporting period from March 2022, if the loss wasn't probable, it was certainly reasonably possible, and thus Defendants violated GAAP by failing to disclose in its financial statements a loss contingency arising from the government's having communicated to Defendants its awareness of possible illicit cash transfers Defendant Wiederhorn orchestrated between FAT Brands and FCCG.

147. Knowing that the SEC and DOJ had manifested the awareness of a potential material claim against FAT Brands when they notified FAT Brands of the investigation prior to the start of the Class Period, ASC 450 required that Defendants undertake a reasonable investigation to determine the likelihood that the DOJ's potential claim related to the unauthorized payments from FAT Brands to FCCG would result in a material loss to FAT Brands.

148. If not already aware, Defendants Kuick and Rosen would have, in the course of their mandatory ASC 450 inquiry, learned that FAT Brands had made numerous illicit payments to FCCG and, ultimately, Defendant Wiederhorn.

149. Defendants were aware at all relevant times that the Company violated GAAP, that the SEC and DOJ were investigating the Company's violations, and that the Company would more likely than not face penalties for its violations.

150. The Company should have begun investigating its liability as soon as the SEC and DOJ notified the Company of its investigation in December 2021, prior to the start of the Class Period. The Company should have known the scope of the self-dealing payments, at the very latest, when public reports of the payments began being published as front page news in major media in February 2022.

151. The Company's refusal to provide an estimate of its liability—or to take a provision reflecting that estimate—due to the Company's inability to "predict the outcome of the investigations, including any fines or penalties that may be imposed" is contrary to established law and the applicable accounting principles.

152. Examples in ASC 450 illustrate why Defendants were required to disclose estimated losses even if those estimates were uncertain or only represented a portion of any potential settlement. Under ASC 450-20-55-18/19:

> An entity may be litigating a dispute with another party. In preparation for the trial, it may determine that, based on recent developments involving one aspect of the litigation, it is probable that it will have to pay $2 million to settle the litigation. Another aspect of the litigation may, however, be open to considerable interpretation, and depending on the interpretation by the court the entity may have to pay an additional $8 million over and above the $2 million. In that case, paragraph 450-20-25-2 requires accrual of the $2 million if that is considered a reasonable estimate of the loss. Paragraphs 450-20-50-3 through 50-8 require disclosure of the additional exposure to loss if there is a reasonable possibility that the additional amounts will be paid.

153. Even if certain Defendants were unaware of the illicit self-dealing payments at the time it took place, Defendants were required to accrue a contingent liability or disclose an estimate once they became aware that the SEC and DOJ had identified and began investigating the potentially illegal payments.

154. Defendants also acted with scienter in that they knew, or recklessly disregarded, that the Company's annual and quarterly reports filed with the SEC

during the Class Period were materially false and misleading in the absence of the disclosures required by ASC 450.

155. As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

156. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased publicly traded FAT Brands securities during the Class Period and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants and the officers and directors of the Company at all relevant times, members of their immediate families and legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

157. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class, and that they are geographically dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

158. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

159. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

160. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the Exchange Act;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages as a result of the decline in value of the Company's securities when the truth was revealed and, if so, what is the proper measure of damages.

161. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

162. Plaintiff and the Class will rely, in part, upon the presumption of reliance on Defendants' material misrepresentations pursuant to the fraud-on-the-market doctrine because the Company's securities traded in efficient markets during the Class Period, in that, among other things:

(a) Defendants made public misrepresentations of, or failed to disclose, material facts during the Class Period;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC;

(c) The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

(d) The Company's securities were liquid and traded with moderate to heavy volume during the Class Period. On average, 67,000 shares of the Company's Class A common stock, 34,000 shares of the Company's Class B common stock, and 67,000 shares of the Company's Series B preferred stock, or approximately 1.2%, 2.7%, and 1.2% respectively, of the Company's total shares outstanding, were traded weekly, permitting a very strong presumption that the shares traded on an efficient market;

(e) The Company traded on NASDAQ, and was covered by multiple analysts;

(f) The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the

Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

163. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

164. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against The Company and the Defendants**

165. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

166. This Count is asserted against the Company and the Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

167. During the Class Period, the Company and the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

168. The Company and the Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

169. The Company and the Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The Company and the Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of the Company's allegedly false and misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

170. The Defendants, who are the senior officers of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them

or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

171. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. Unaware of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of The Company's and the Defendants' false and misleading statements.

172. Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially inflated by The Company's and the Defendants' false and misleading statements and by the material adverse information which The Company and the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

173. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

174. By reason of the foregoing, The Company and the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for the substantial damages they suffered in connection with their purchases of the Company's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of The Exchange Act**
**Against The Individual Defendants**

175. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

176. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. In carrying out the duties and responsibilities of their senior positions, they knew or recklessly disregarded the undisclosed material facts alleged above, the misrepresentation or omission of which rendered the challenged statements false and misleading.

177. As officers and directors of the Company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company and to correct promptly any public statements issued by the Company which had become materially false or misleading.

178. Due to their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

179. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein, which artificially inflated the market price of the Company's securities during the Class Period.

180. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against Defendants as follows:

A. Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff as class representative and Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all of the Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and expert fees; and

D. Awarding such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: April 7, 2025

**THE ROSEN LAW FIRM, P.A.**

*/s/Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: philkim@rosenlegal.com

*Lead Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071. I am over the age of eighteen.

On April 7, 2025, I electronically filed the foregoing AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on April 7, 2025.

*/s/Laurence M .Rosen*